UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| SIDNEY DOUGLAS ADAMS, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | Nos: | 3:05-cr-032 |
| | ) | | 3:10-cv-296 |
| UNITED STATES OF AMERICA, | ) | | (VARLAN/GUYTON) |
| | ) | | |
| Respondent. | ) | | |

**MEMORANDUM**

This is a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 filed by petitioner Sidney Douglas Adams ("petitioner"). The government has filed its response to the motion and petitioner has filed a reply. For the following reasons, the § 2255 motion to vacate will be **DENIED** and this action will be **DISMISSED**.

**I.     Standard of Review**

This Court must vacate and set aside petitioner's conviction upon a finding that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255. To prevail under § 2255, petitioner "must show a 'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)).

Under Rule 8 of the Rules Governing Section 2255 Proceedings In The United States District Courts, the Court is to determine after a review of the answer and the records of the case whether an evidentiary hearing is required. If the motion to vacate, the answer and the records of the case show conclusively that petitioner is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

## II. Factual Background

Pursuant to a written plea agreement, petitioner pleaded guilty to conspiracy to distribute and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). He was sentenced to a term of imprisonment of 151 months. [Criminal Action No. 3:05-cr-32, Doc. 402, Judgment]. Petitioner was denied the two-level reduction of acceptance of responsibility and instead received a two-level enhancement for obstruction of justice. Petitioner's sentence was affirmed on direct appeal. *United States v. Adams*, 321 F. App'x 449 (6th Cir. 2009).

Petitioner and his wife and co-defendant, Sheila Adams, were involved in a large-scale marijuana distribution scheme with several other co-conspirators. The Sixth Circuit summarized the factual background of the Adams' convictions and sentences as follows:

> Starting in 2004, Mr. Adams, along with coconspirator Jeremy Robbins and others, traveled to Arizona on multiple occasions to obtain large quantities of marijuana to resell in eastern Tennessee. Mr. Adams personally made at least three of these trips, obtaining 900 pounds or more of marijuana per trip. Jeremy Robbins was the ringleader of the operation and conducted the drug enterprise from his home in Dandridge, Tennessee. He also arranged to have some of the marijuana stored in a barn on the Adamses' property in nearby

Hamblen County. Mrs. Adams observed sizable quantities of marijuana at Robbins's residence and sometimes assisted in repackaging it for resale.

When Robbins was arrested in March 2005, he contacted Mr. Adams and asked him to remove approximately 1,200 pounds of marijuana from the barn. Mr. Adams then assumed full control of the marijuana and sold some or all of it with the help of his friend Chris Oakes. The government did not learn about the marijuana stored in the barn until the following month. By that time, Mr. Adams had already moved and/or sold it. Mr. and Mrs. Adams hid the proceeds of the drug sales from both Robbins-who was then in jail-and the government.

In November 2005, the Adamses signed plea agreements that included a pledge to cooperate with the government in its investigation of the drug conspiracy, but they did not immediately enter guilty pleas in court. Mr. Adams eventually pled guilty in August 2006 pursuant to his plea agreement and was placed in the Blount County Detention Facility to await sentencing. Mrs. Adams did not enter her guilty plea until February 2007 so that she could remain free on pretrial release.

Federal agents interviewed Mr. Adams six times between December 2005 and September 2006. These interviews were conducted pursuant to his plea agreement and were intended to prepare him for his role as a government witness in the trials of coconspirators Robbins and Robbins's wife Diana. The subject of the marijuana stored in the Adamses' barn was covered extensively during the interviews. Mr. Adams gave different answers in each interview regarding the quantity of the marijuana, who moved it (and how), and what happened to it after Robbins's arrest. He claimed at first that Robbins had asked him to move the marijuana to the door of the barn and that, after he complied, unknown individuals retrieved the marijuana overnight. Later, Mr. Adams said that he had delivered approximately 350 to 400 pounds of the marijuana to Robbins's customers, that he had received no payment, and that he then moved the remaining 600 pounds to the door of the barn to be picked up per Robbins's instructions.

Mrs. Adams was interviewed about the relocated marijuana in August 2006. She initially claimed not to remember anything about it, but ultimately told the agents that Mr. Adams was supposed to move the marijuana to the door of the barn, where some person whose identity she did not know or could not recall would collect it.

3

On September 8, 2006, coconspirator Diane Robbins met with federal agents. She contradicted Mr. Adams's story, telling the agents that Mr. Adams had taken the marijuana from the barn, sold it, and kept the proceeds of around one million dollars for himself. According to Diana Robbins, Mrs. Adams knew about the marijuana and was currently spending the drug proceeds. Robbins and his wife entered guilty pleas on September 13, 2006, shortly before their scheduled trial, where Mr. Adams was expected to testify as a government witness.

On September 22, 2006, Mr. Adams met with Assistant United States Attorney (AUSA) Hugh Ward and other federal agents. Ward told Mr. Adams at the beginning of the meeting that he was going to file a motion for downward departure based on Adams's "substantial assistance," recommending a sentence of 42 months. Mr. Adams admitted at the meeting that he had lied in his previous interviews and during his preparation for the Robbinses' trial. He also conceded that he would have presented perjured testimony during the trial had the Robbinses not pled guilty.

Mr. Adams stated at the meeting that he and his friend Chris Oakes, on their own initiative, had taken the marijuana from the barn shortly after Robbins's arrest and transported it to a rental house in Rogersville, Tennessee, where it remained for a couple of weeks. Next, at Robbins's request, Mr. Adams moved around 600 pounds of marijuana back to the barn by himself, after which someone else had retrieved it. Mr. Adams admitted delivering marijuana to four of Robbins's customers, but denied receiving any payment. He also denied that he had sold the marijuana himself and kept the proceeds. Mr. Adams claims that, before leaving the meeting, AUSA Ward told Mr. Adams's counsel that he still intended to file the motion for a downward departure, but that he was no longer in a position to tell the court that Adams qualified for a "safety-valve" sentence reduction.

On October 6, 2006, however, AUSA Ward sent a letter to Mr. Adams's counsel informing him that, because Adams had not been truthful in his earlier interviews, Ward was not going to file the motion for a downward departure. Ward instead stated that he was going to ask the district court to enhance Mr. Adams's sentence for obstruction of justice. The government later filed a sealed sentencing memorandum requesting that the court apply an obstruction-of-justice enhancement to Mr. Adams's sentence. In the memorandum, the government asserted that Mr. Adams had not been truthful in his interviews subsequent to signing his plea agreement, and that he was still withholding information and evidence relevant to the case. The memorandum

4

concluded that, as of that time, Mr. Adams did not meet the criteria for a safety-valve below-minimum sentence.

While Mr. Adams was incarcerated at the Blount County Detention Facility following his guilty plea, he made frequent calls to Mrs. Adams. They knew, based on a warning played at the beginning of each call, that their calls were being recorded and were subject to monitoring. A Drug Enforcement Administration (DEA) agent working on the case subsequently obtained the recordings of those phone calls. The recordings reveal that Mr. Adams instructed Mrs. Adams to lie to the investigators regarding the funds that they had received from the sale of the marijuana. Mr. Adams can also be heard admitting that he had lied to the investigators about the marijuana in the barn, while Mrs. Adams stated that she had lied to her own attorney about the drug money. The tapes reflect the Adamses' evolving strategy regarding how much information to disclose to the investigators. At one point Mr. Adams mulled over the possibility of coming clean with the investigators by "tell [ing] them everything about everything, don't hold anything back. I might have to help them find some things."

In November 2006, when the Adamses were confronted with the recordings, they admitted to the investigators that they were hiding drug proceeds. Mrs. Adams subsequently surrendered $30,380 through her attorney. DEA agents also recovered an additional $128,000 hidden on the Adamses' property after Mr. Adams revealed the location of the stash.

Mr. Adams was interviewed a final time in December 2006. In that interview, he claimed that he and his cousin, Dion Carter, stored the marijuana from the barn in a van for about a week following Robbins's arrest. He said that he and Chris Oakes subsequently repackaged the marijuana for resale and delivered some of it to Robbins's old customers. Mr. Adams again conceded that he would have perjured himself at the Robbinses' trial had he testified. At the conclusion of the interview, AUSA Ward told Mr. Adams there was no way to be sure that he was telling the truth without the use of a polygraph examination. Ward identified three areas of concern: (1) information he had received from other individuals that, at the time of Robbins's arrest, Robbins had stored $300,000 in drug proceeds in safes in the Adamses' barn; (2) additional information that Mr. Adams had initiated the delivery of marijuana to one of Robbins's customers and collected $100,000 in proceeds; and (3) that Ward could not be positive that Mrs. Adams had turned over all the drug money in her possession.

Mr. Adams's counsel was notified by AUSA Ward the next month that the government would be seeking a sentencing enhancement for obstruction of justice. Ward also stated that Mr. Adams would not qualify for a safety-valve sentence reduction unless Mr. Adams submitted to a polygraph examination. Shortly thereafter, Mr. Adams's counsel arranged for Mr. Adams to take a polygraph test with a private examiner. Mr. Adams was asked about the first two of the three previously mentioned areas of concern identified by Ward. According to Mr. Adams's counsel, Mr. Adams "passed" the examination. Ward responded, however, that the government would not accept the results of the examination because it was "self-serving" and had not been administered by the government.

After her February 2007 guilty plea, Mrs. Adams agreed to submit to a DEA polygraph examination, which was conducted the following month. The examination consisted of two significant questions. When Mrs. Adams was asked, "Are you hiding any drug proceeds from the government?", she responded "no." The polygraph analysis deemed this answer inconclusive. When Mrs. Adams was asked if she had participated in any drug transactions after posting bond, her negative answer was deemed to be deceptive. Mrs. Adams was given an opportunity to clarify her answer. She then admitted that "she had provided marijuana to her friend Misty on seven or eight occasions after her release." Mrs. Adams also conceded that she took oxycodone although she had no prescription for the drug.

*Id*. at 452-54.

### III. Discussion

Petitioner alleges numerous instances of ineffective assistance of counsel in support of his § 2255 motion. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance

6

prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The issue is whether counsel's performance "was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*). Because he is seeking relief under § 2255, petitioner bears the burden of proving by a preponderance of the evidence that his counsel was deficient. *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

As noted, petitioner alleges numerous instances of ineffective assistance of counsel. The Court will consider each one in turn.

### A. Failure to Permit Polygraph Examination

Petitioner alleges that his attorneys' long-standing opposition to polygraph examinations resulted in ineffective assistance of counsel in his case. According to petitioner, had he taken a polygraph examination administered by the government, he would have received a two-level reduction for acceptance of responsibility. He bases this argument on the fact that his wife received the reduction, despite an enhancement for obstruction of justice, because the Court concluded she had "done everything that the government asked her to do" which included taking a polygraph examination. [Criminal Action No. 3:05-cr-32, Doc. 533, Transcript of Sentencing Hearing for Sheila Adams, p. 28].

The Court's decision to deny petitioner the two-level reduction was not based, however, on his refusal to undergo a government-administered polygraph examination but instead on his repeated lies and obstructive behavior. The Court found that petitioner had not been truthful during his interviews with the government after entering his guilty plea and had in fact admitted lying about the concealed marijuana and the proceeds from its distribution. [*Id*., Doc. 428, Transcript of Sentencing Hearing for Sidney Adams on January 18, 2007, pp. 8-10]. The Court specifically found that "[b]ased on the overwhelming evidence presented by the government, it is clear to the court that defendant obstructed and continues to obstruct justice and evade responsibility for his on-going criminal activity." [*Id*. at 9]. The Court went on to question "whether defendant's latest admissions concerning the missing marijuana and/or marijuana proceeds are truthful." [*Id*. at 10]. For that reason, the Court concluded that

8

petitioner had not accepted responsibility for his conduct for purposes of the two-level reduction. [*Id.*].

After the Court's previous comments, petitioner elected to testify. [*Id.* at 16]. Petitioner admitted lying to the government, the probation officer, and his own attorneys after entry of his plea agreement as well as committing crimes while on pretrial release, although he insisted that he was finally telling the truth. [*Id.* at 16-28]. The Court then sentenced petitioner without altering the decision that he was not entitled to the two-level reduction.

> The defendant admitted to obstructing justice in this case and, in the court's opinion, is continuing to obstruct justice by not informing the court of all the information he has relevant to the whereabouts of the missing marijuana and its proceeds. Simply stated, Mr. Adams, I don't believe you.
>
> The court acknowledges that the defendant has worked lawfully his entire life until he was recruited into this conspiracy and has no prior criminal history. Defendant's actions subsequent to signing his plea agreement cost him safety valve eligibility as well as a reduction for acceptance of responsibility, resulting in a substantial increase in the length of defendant's sentence.

[*Id.* at 44-45].

There is nothing in the record to suggest that petitioner would have received the two-level reduction had he taken a polygraph examination administered by the government. Accordingly, his claim of ineffective assistance of counsel in this regard lacks merit.

### B. Failure to Rebut Audiotaped Telephone Calls

Petitioner alleges his attorneys failed to rebut the government's playing of the audiotaped telephone calls from the Blount County Jail and failed to place the calls in context. According to petitioner, the government presented an edited version of his

9

conversations with his wife which contained aggravating evidence against him, but his attorneys failed to present any of the mitigating evidence contained in the telephone calls. Petitioner does not state what the mitigating evidence would have been, other than to state that "[t]he calls clearly show that my only concern became keeping my wife out of jail and with our children. I knew the only way to achieve this was to be totally honest with the government." [*Id*., Doc. 580, Motion to Vacate, Attachment 1, p. 10].

Petitioner does not deny that the recorded telephone calls indicated a pattern of obstructive behavior. In any event, his claim of ineffective assistance of counsel in this regard lacks merit. In an evidentiary hearing prior to sentencing to consider whether petitioner qualified for the safety valve, DEA Special Agent Dave Lewis detailed the recorded telephone calls over the objection of defense counsel. He did so in order to show that petitioner had withheld information from the government and was providing the government with false information. [*Id*., Doc. 427, Transcript of Evidentiary Hearing for Sidney Adams on January 10, 2007, pp. 23-50].

Defense counsel unsuccessfully objected to entry of excerpts of the recorded conversations on the basis that they were taken out of context. [*Id*. at 33-34]. Defense counsel cross-examined Special Agent Lewis extensively about the recordings to place them in context, especially with respect to specific interviews the government had with petitioner. [*Id*. at 52-78]. Counsel did not render ineffective assistance.

10

### C.  Failure to Demonstrate Violation of Attorney-Client Privilege

Petitioner alleges that his attorneys failed to demonstrate to both the trial and appellate court that his attorney-client privilege was violated by the intercepted telephone calls. According to petitioner, he made several telephone calls to his attorneys which were intercepted by the Blount County Jail and turned over to the prosecutors but his attorneys failed to present the issue to the courts. There is nothing in the record, however, to suggest that the prosecution listened to petitioner's telephone conversations with his attorney. This claim of ineffective assistance of counsel lacks merit.

### D.  Failure to Allow Petitioner to Strike a Deal

Petitioner alleges that his attorneys refused to allow him to make a deal with the prosecutor in the last days before sentencing. According to petitioner, he was prepared to agree to a sentence of ten years in return for certain concessions, but his attorneys threatened to quit if he made such a deal. There is nothing in the record, however, to suggest that the government would have agreed to such a deal, especially given petitioner's lies and obstruction of justice. Indeed, in response to the § 2255 motion, the government states unequivocally that under the circumstances it "would not have agreed to limit petitioner's sentencing exposure to the statutory mandatory minimum of 120 months." [*Id*., Doc. 585, Response, p. 25]. Petitioner cannot demonstrate ineffective assistance of counsel in this regard.

### E. Failure to Properly Allege the Government's Breach of the Plea Agreement

Petitioner alleges that, although his attorneys raised the government's breach of the plea agreement on direct appeal, they failed to raise it in the trial court which resulted in a "plain error" review rather than a "de novo" review. Petitioner argues that he would have received relief on appeal had the Sixth Circuit employed a "de novo" review. This claim lacks merit. The Sixth Circuit specifically found that it was the petitioner, not the government, who breached the plea agreement when he, "rather than providing substantial assistance, actually *impeded* the investigation with his repeated lies" and based upon his failure to "cooperate fully, truthfully, and completely." *United States v. Adams*, 321 F. App'x at 457 (internal quotation marks omitted).

### F. Failure to Disclose Safety Valve Agreement to the Trial Court

Petitioner alleges that his attorneys failed to disclose to the trial court the safety valve agreement that had been reached with then U.S. Attorney James Dedrick. According to petitioner, his counsel met with Mr. Dedrick, who agreed to review the case personally and decide whether petitioner was eligible for the safety valve reduction. This claim overlooks the fact that the Court determined that petitioner was not eligible for the safety valve because of his failure to provide the government with truthful information and the Sixth Circuit agreed.

> The district court determined that Mr. Adams had failed to satisfy the fourth and fifth elements of the safety-valve test. Specifically, the court found that Mr. Adams had engaged in a continuing criminal enterprise and that he

12

>   had not truthfully disclosed to the government all the information he had about the offense.
>
>   We need not decide whether the district court erred in finding that Mr. Adams had failed to satisfy the fourth safety-valve requirement because his argument concerning the fifth § 3553(f) element-truthfully providing all of the information he had about the offense by the time he was sentenced-is without merit. Mr. Adams primarily contends that, after his deception was discovered, he did everything possible to convince the government that he was being truthful, including his submission to a polygraph examination. But the district court found at sentencing that "the defendant has obstructed and continues to obstruct justice and evade responsibility for his ongoing criminal activity."
>
>   The district court's finding that Mr. Adams was still not being truthful at sentencing is supported by the evidence. A DEA agent testifying for the government pointed out that many of the proceeds from the crime were still not accounted for, and the taped telephone conversations show that Adams knew more information than he was sharing with the police. Because the court's distrust of Mr. Adams is well supported by the record, its finding that Adams continued to obstruct justice is not clearly erroneous.

*Id*. at 458-59. Whether Mr. Dedrick would have recommended the safety valve for petitioner is irrelevant and this claim of ineffective assistance of counsel lacks merit.

### G.  Cumulative Effect

Petitioner alleges he is entitled to relief based upon the cumulative effect of his attorneys' errors. The Sixth Circuit has held that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

Petitioner has not demonstrated error on the part of trial counsel, however, and is not entitled to relief on this claim. *Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) ("[Petitioner's] cumulative-error claim therefore fails because there are simply no errors to cumulate.").

Based upon the foregoing, petitioner has failed to demonstrate that he received ineffective assistance of counsel under the standard set forth in *Strickland*.

## IV. Conclusion

Petitioner is not entitled to relief under § 2255 and his motion to vacate, set aside or correct sentence will be **DENIED**. This action will be **DISMISSED**. Petitioner's motion for a ruling will be **DENIED** as **MOOT**. The Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous. Therefore, this Court will **DENY** petitioner leave to proceed *in forma pauperis* on appeal. *See* Rule 24 of the Federal Rules of Appellate Procedure. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253; Rule 22(b) of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE ORDER WILL ENTER.**

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE